12-276-cv
Steel Institute of New York v. City of New York

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: December 20, 2012      Decided: May 7, 2013)

Docket No. 12-276

- - - - - - - - - - - - - - - - - - - - -x

STEEL INSTITUTE OF NEW YORK,

Plaintiff-Appellant,

- v.-

CITY OF NEW YORK,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, Chief Judge, CALABRESI and SACK, Circuit Judges.

The Steel Institute of New York appeals the judgment of the United States District Court for the Southern District of New York (McMahon, J.), which granted the City of New York's cross-motion for summary judgment and dismissed the complaint, alleging that the City's regulation of cranes and other hoisting equipment is preempted by federal law.  For the following reasons, we affirm.

BRIAN A. WOLF, Smith, Currie & Hancock, LLP, Fort Lauderdale, Florida (J. Daniel Puckett, Smith, Currie & Hancock, LLP, Atlanta, Georgia, on the brief), for Appellant.

TAHIRIH M. SADRIEH (Edward F. X. Hart and Karen Selvin, on the brief), for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, for Appellee.

M. Patricia Smith, Solicitor of Labor, U.S. Department of Labor, Washington, D.C. (Joseph M. Woodward, Charles F. James, and Allison G. Kramer, on the brief), for the Secretary of Labor as Amicus Curiae in Support of Appellee.

DENNIS JACOBS, Chief Judge:

The Steel Institute of New York, advancing the interests of the construction industry, sues the City of New York challenging local statutes and regulations that govern the use of cranes, derricks, and other hoisting equipment in construction and demolition.  The Steel Institute argues that they are preempted by the Occupational Safety and Health Act (the "Act") and federal standards promulgated by the Occupational Safety and Health Administration ("OSHA").  The United States District Court for the Southern District

2

of New York (McMahon, J.) dismissed the suit on summary judgment.  We affirm.

# I

The Steel Institute sought declaratory and injunctive relief invalidating the City regulations listed in the margin[1] on the grounds that they are preempted by the Act and OSHA's regulations, violate the dormant Commerce Clause, and violate the Steel Institute's procedural and substantive due process rights.

Cross-motions for summary judgment were stayed pending the ongoing amendment of OSHA's crane regulations, which were published August 9, 2010, and went into effect November 8, 2010.  The preamble of the amended regulations added a statement on "federalism," which referenced this lawsuit and disclaimed preemption of "any non-conflicting local or municipal building code designed to protect the public from the hazards of cranes."  Cranes and Derricks in Construction, 75 Fed. Reg. 47,906, 48,129 (Aug. 9, 2010). The cross-motions were re-filed with addenda dealing with

---

[1] N.Y.C. Admin. Code §§ 28-3316.1-.6, .7.1-.8, 3319.1, .3-.8.7, .8.8(3)-(4), .8.8(6)-(7), .9-.9.2; Reference Standard 19-2 §§ 3.0-8.1, 9.0, 10.0, 13.1-21, 22.2-30.0. See J.A. 2.

the amendments. The Department of Labor filed an amicus curiae brief in the district court in support of the City's position, as it has here.

The district court granted the City's cross-motion for summary judgment in December 2011, chiefly relying on Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88 (1992). See Steel Inst. of N.Y. v. City of N.Y., 832 F. Supp. 2d 310, 320-32 (S.D.N.Y. 2011). Although the court recognized that the City regulations directly and substantially regulate worker safety and health in an area where an OSHA standard exists (which usually would trigger preemption), the court concluded that the City regulations are saved from preemption under Gade because they are laws of "general applicability." Id. at 323-27. "[C]onsiderable deference" was given to the Secretary of Labor's interpretation of the preemptive effect of the Act and the OSHA regulations. Id. at 328. The district court also summarily dismissed the Commerce Clause and due process claims. Id. at 332-37. The Steel Institute's appeal challenges only the ruling on preemption.

We review de novo an order granting summary judgment, drawing all factual inferences in favor of the non-moving

4

party. Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No material fact is at issue in this case.

**II**

The federal government regulates worker safety through the Occupational Safety and Health Act, which is administered by OSHA. See 29 U.S.C. §§ 651-78. The Act authorizes promulgation of occupational safety or health standards, id. § 655, that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," id. § 652(8). It is significant to our analysis that the Act does not protect the general public, but applies only to employers and employees in workplaces. See, e.g., id. § 651(b)(1).

In the absence of a federal standard, the Act allows states to regulate occupational safety or health issues. Id. § 667(a). If there is a federal standard in place, a state may submit a "State plan" for the Secretary's approval by which the state "assume[s] responsibility for development

5

and enforcement" of occupational safety and health standards in the area covered by the federal standard.  Id. § 667(b)-(c).

OSHA has promulgated regulations concerning the use of cranes, derricks, and hoisting equipment: 29 C.F.R. § 1926 Subpart CC governs "Cranes and Derricks in Construction," and Subpart DD governs "Cranes and Derricks Used in Demolition and Underground Construction."  The federal standards apply to "power-operated equipment, when used in construction, that can hoist, lower and horizontally move a suspended load," including various types of cranes, derricks, trucks, and other hoisting equipment.  29 C.F.R. § 1926.1400(a).

Among other things, the federal rules regulate:

- ground conditions that support cranes and similar equipment, id. § 1926.1402;

- procedures and conditions for design, assembly, disassembly, operation, testing, and maintenance of the machinery, id. §§ 1926.1403, .1417, .1412, .1433;

- proximity of the equipment to power lines during assembly, operation, and disassembly, id. §§ 1926.1407-.1411;

- proximity of employees to the machinery and hoisted loads, id. §§ 1926.1424-.1425;

- signaling between workers, id. §§ 1926.1419-.1422;

- fall protection for workers, <u>id.</u> § 1926.1423; and

- worker qualification, certification, and training, <u>id.</u> §§ 1926.1427-.1430.

OSHA has authority to enter and inspect regulated worksites, and may enforce the regulations through citations, monetary penalties, criminal penalties, and by seeking injunctive relief. <u>See, e.g.</u>, 29 U.S.C. §§ 662, 666.

## III

The City's crane regulations[2] are part of the Building Code and are enforced by the New York City Department of Buildings ("DOB"). <u>See</u> N.Y.C. Admin. Code §§ 28-101.1, -201.3. "The purpose of [the City's construction code, which includes the Building Code,] is to provide reasonable minimum requirements and standards . . . for the regulation of building construction in the city of New York in the interest of public safety, health, [and] welfare . . . ." <u>Id.</u> § 28-101.2.

The statutes at issue in this case are codified in Chapter 33 of the Building Code, which concerns "Safeguards During Construction or Demolition." At the outset, Chapter

_____

[2] Although the City regulations are referenced in this opinion as "crane regulations," they apply to other equipment as well, including derricks and hoists.

33 delineates its scope: "The provisions of this chapter shall govern the conduct of all construction or demolition operations with regard to the safety of the public and property. For regulations relating to the safety of persons employed in construction or demolition operations, OSHA Standards shall apply." Id. § 28-3301.1.

In the district court, the City adduced evidence of local accidents caused by cranes, derricks, and other hoists. J.A. 134-97. For the period 2004 through 2009, the City cited fifteen instances of hoisting equipment failures that caused injury to twenty-seven members of the public and fifteen workers, and the deaths of one member of the public and eight workers. J.A. 136. Relying on a declaration from a DOB engineer, the district court found that "because New York City is the most densely populated major city in the United States, construction worksites necessarily abut, or even spill over into adjoining lots and public streets." Steel Inst., 832 F. Supp. 2d at 314. "Cranes therefore pose a unique risk to public safety in New York City--at least when they are used away from isolated commercial or industrial yards." Id.

8

Generally, the City requires that hoisting equipment "be installed, operated, and maintained to eliminate hazard to the public or to property."[3] N.Y.C. Admin. Code § 28-3316.2. Specific requirements on hoisting equipment include:

- following an accident, the owner or person in charge of hoisting equipment must immediately notify the DOB and cease operation of the equipment, id. § 28-3316.3;

- hoisting equipment must: be designed, constructed, and maintained in accordance with DOB rules; be approved by the DOB; and display appropriate permits, id. §§ 28-3316.4-.5, .8;

- hoist ropes must be regularly inspected and replaced in accordance with DOB rules, id. § 28-3316.6; and

- operators of hoisting equipment must be qualified to operate the equipment and must lock it before leaving, id. § 28-3316.7.

A separate set of requirements applies more specifically to cranes and derricks. See id. § 28-3319. These include a requirement that "[n]o owner or other person shall authorize or permit the operation of any crane or derrick without a certificate of approval, a certificate of operation and a

---

[3] The City regulations apply broadly to "hoisting equipment," defined as "[e]quipment used to raise and lower personnel and/or material with intermittent motion." N.Y.C. Admin. Code § 28-3302.1. That includes "power operated machine[s] used for lifting or lowering a load," including but not limited to "a crane, derrick, cableway and hydraulic lifting system, and articulating booms." Id.

certificate of on-site inspection." Id. § 28-3319.3; see also id. § 28-3319.4-.6. The crane and derrick requirements do not apply to "cranes or derricks used in industrial or commercial plants." Id. § 28-3319.3(6).

Even more stringent requirements are imposed on "tower" and "climber" cranes.[4] See id. § 28-3319.8. For these contraptions, a licensed engineer must submit a detailed plan for "erection, jumping, climbing, and dismantling." Id. § 28-3319.8.1. Before operating such a crane, the general contractor must conduct a "safety coordination" meeting with a licensed engineer, the crane operator, and other designated individuals. Id. § 28-3319.8.2. In addition, the DOB publishes "Reference Standards" ("RS") governing this equipment.[5]

---

[4] A tower crane is a crane that is mounted on a vertical mast or tower, and a climber crane is a crane supported by a building that can be raised or lowered to different floors of the building. Id. § 28-3302.

[5] For example, RS 19-2 regulates the design, construction, and testing of "power operated cranes and derricks." Mobile cranes constructed prior to October 2006 must comply with standards promulgated by the American National Standards Institute ("ANSI") in 1968. RS 19-2 § 4.1.1; see ANSI Standard B30.5 (1968). Mobile cranes constructed after October 2006 must comply with one of two standards promulgated in 2004. RS 19-2 § 4.1.2; see ANSI Standard B30.5 (2004); European Comm. for Standardization CEN EN 13000 (2004).

10

To enforce this regulatory scheme, the DOB issues a stop-work order if it finds that any crane, derrick, or hoisting machine is "dangerous or unsafe."  RS 19-2 § 9.1. In sum, the City's statutes and regulations provide a comprehensive framework to regulate the design, construction, and operation of cranes, derricks, and other hoisting equipment in the City.

**IV**

The Steel Institute argues that the City's crane regulations are preempted by the Act and OSHA regulations because they impose occupational health and safety standards in an area where federal standards already exist.  The City responds that its regulations are not preempted under the analysis in Gade v. National Solid Wastes Management Ass'n, 505 U.S. 88 (1992), and that, even if they are, they are saved by the exception afforded by Gade for laws of general applicability.

Preemption can be either express or implied.  Id. at 98.  Implied preemption may take the form of field preemption (if the federal scheme is so pervasive as to displace any state regulation in that field) or conflict

11

preemption (if state regulation makes compliance with federal law impossible or otherwise frustrates the objectives of Congress).  Id.; see also N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) (per curiam).

There is a strong presumption against preemption when states and localities "exercise[] their police powers to protect the health and safety of their citizens." Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 484-85 (1996). "Because of the role of States as separate sovereigns in our federal system, we have long presumed that state laws . . . that are within the scope of the States' historic police powers . . . are not to be pre-empted by a federal statute unless it is the clear and manifest purpose of Congress to do so."  Geier v. Am. Honda Motor Co., 529 U.S. 861, 894 (2000) (Stevens, J., dissenting); see also N.Y. SMSA Ltd. P'ship, 612 F.3d at 104.  "Protection of the safety of persons is one of the traditional uses of the police power," which is "one of the least limitable of governmental powers."  Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 82-83 (1946).

Here, New York City has exercised its fundamental police power to protect public safety, but has done so by regulating an area where federal occupational standards exist.  Gade controls.  In that case, Illinois enacted statutes regulating the licensing and training of employees who work with hazardous waste.  Gade, 505 U.S. at 91.  The issue was whether the Illinois regime was preempted by OSHA regulations on "Hazardous Waste Operations and Emergency Response," which included training requirements for hazardous waste workers.  Id. at 92.

The Court characterized the Illinois laws as "dual impact" statutes because they "protect[ed] both workers and the general public."  Id. at 91.  A plurality of the Court held that the Act displaced conflicting state rules through implied conflict preemption (there being no express preemption in the Act).[6]  Id. at 98-99 (O'Connor, J., plurality op.).  Viewing the Act as a whole, the Court concluded that it "precludes any state regulation of an occupational safety or health issue with respect to which a federal standard has been established, unless a state plan

---

[6]  Justice Kennedy's separate concurrence opined that the Act expressly preempts state occupational safety and health standards.  Id. at 111-12 (Kennedy, J., concurring).

has been submitted and approved pursuant to § 18(b)." Id. at 102.

The Gade Court rejected the state's argument that dual impact statutes are not preempted. Id. at 104-05. "Although 'part of the pre-empted field is defined by reference to the *purpose* of the state law in question, . . . another part of the field is defined by the state law's *actual effect*.'" Id. at 105 (quoting English v. Gen. Elec. Co., 496 U.S. 72, 84 (1990)) (emphases added). Accordingly, a state law that "constitutes, in a direct, clear and substantial way, regulation of worker health and safety" is preempted under the Act. Id. at 107 (internal quotation marks omitted).

Critically, the Court recognized an exception for state and local regulations that are of "general applicability." Id. But the Court held that because the Illinois statutes were primarily "directed at workplace safety," they were not laws of general applicability and therefore succumbed to preemption. Id. at 107-08.

The New York City crane regulations are unquestionably "dual impact" regulations. For the most part, they are intended to protect public safety and welfare. See N.Y.C.

14

Admin. Code § 28-101.2.  There is considerable evidence of accident risks posed by cranes, derricks, and other hoisting equipment.  See, e.g., Steel Inst., 832 F. Supp. 2d at 314; J.A. 134-97.  Many of the provisions are specifically designed to protect the safety of the general public in the vicinity of cranes and other hoisting equipment.  See, e.g., RS 19-2 § 23.3.5 (prohibiting loads from being carried over occupied buildings unless top two floors are evacuated).  The risk to the public in New York City is substantial and palpable.[7]

That is the *purpose* of the City regulations; we must also gauge their *effect*.  Gade, 505 U.S. at 105.  In their effect, the regulations protect worker health and safety in a "direct, clear and substantial" way.  Id. at 107.  For example, Section 3316.7 of the Building Code provides that

_____

[7]  During Hurricane Sandy in October 2012, a crane collapsed and dangled over West 57th Street in Manhattan for nearly a week.  See, e.g., Charles V. Bagli, As Crane Hung in the Sky, a Drama Unfolded to Prevent a Catastrophe Below, N.Y. TIMES, Nov. 6, 2012.  Public accounts suggest that City DOB inspectors had found problems with the crane's wire ropes in the months before the accident and halted work on the site for over a week in September 2012.  Kerry Burke et al., Crane Collapse in Midtown Manhattan as Hurricane Sandy Storms into the East Coast, N.Y. DAILY NEWS, Oct. 29, 2012.  And it was City DOB inspectors who were on site to inspect the crane after it was repaired.  Josh Barbanel, High Drama With Crane Comes to an End, WALL ST. J., Nov. 4, 2012.

only designated, specially qualified workers may operate hoisting equipment. See N.Y.C. Admin. Code § 28-3316.7. Similarly, the regulations require that a detailed plan be submitted for the use of tower or climber cranes, and a safety meeting must be held before a crane is "jumped." Id. § 28-3319.8. While these restrictions protect the general safety of those near and around construction sites, the direct and immediate effect is to protect workers at the site.

The federal standards here--on "Cranes and Derricks in Construction" and "Cranes and Derricks Used in Demolition and Underground Construction"--regulate the same things, i.e., the use of "power-operated equipment," including cranes, derricks, and other hoisting equipment, "when used in construction." 29 C.F.R. § 1926.1400(a). The City regulations may employ different means, but they nonetheless constitute "regulation of an occupational safety or health issue with respect to which a federal standard has been established." Gade, 505 U.S. at 102. Under Gade, the City's crane regulations are preempted unless they are saved from preemption as laws of general applicability.

16

*Gade* exempts from preemption "state laws of general applicability (such as laws regarding traffic safety or fire safety) that do not conflict with OSHA standards and that regulate the conduct of workers and nonworkers alike." 505 U.S. at 107. Even a law that directly and substantially protects workers "cannot fairly be characterized as [an] 'occupational' standard[]" if it "regulate[s] workers simply as members of the general public." Id. But a law "directed at workplace safety" will not be saved from preemption. Id.

The *Gade* exception saves the City regulations from preemption because they are of general applicability. They do not conflict with OSHA standards; at most, the City's regulations provide additional or supplemental requirements on some areas regulated by OSHA. By their terms they apply to the conduct of workers and nonworkers alike.[8]

Most importantly, the City regulations are not directed at safety in the workplace. In *Gade*, the preempted state laws imposed licensing requirements on "hazardous waste

---

[8]  For example, Section 3316.3, which requires that hoisting accidents be reported to the DOB, applies to the "owner or person directly in charge of" the hoisting equipment. N.Y.C. Admin. Code § 28-3316.3. Similarly, Section 3319.3 requires various certificates for the operation of a crane or derrick and applies to "owner[s] or other person[s]." Id. § 28-3319.3.

17

equipment operators and laborers *working at certain facilities*." 505 U.S. at 93 (emphasis added). That law was not saved from preemption as a law of general applicability because it was "directed at *workplace* safety." Id. at 107 (emphasis added). Gade's holding reflects the plain language of the Occupational Safety and Health Act, which focuses only on "employment performed *in a workplace*." 29 U.S.C. § 653(a) (emphasis added). Congress intended that the Act help "reduce the number of occupational safety and health hazards *at their places of employment*." Id. § 651(b)(1) (emphasis added); see also id. § 654 (requiring employers to furnish employees with "a place of employment" free from hazards).

New York's crane regulations, by contrast, apply all over the City, not just in workplaces or construction sites. As the district court found, New York City is always undergoing construction, and construction risks are by no means confined to a single building or lot.[9] "Cranes, which can be as tall as 1800 feet, and move loads as heavy as 825 tons, do not confine themselves to the property on which

_____

[9] When a person hoists a piano into his attic, the risk is between him and his piano; if he hoists it above a pulsing avenue, the risk is not contained and the peril is of a general kind.

18

they are being used when they break, or worse, collapse; they inevitably damage surrounding buildings and risk injuring people in their homes and on the street." Steel Inst., 832 F. Supp. 2d at 314 (internal citation omitted). A salient feature of the City's regime is that crane activity confined to a workplace is *expressly excluded* from the scope of the City regulations: the regulations do not apply "to cranes or derricks used in industrial or commercial plants or yards" (unless used for construction of the facility itself). N.Y.C. Admin. Code § 3319.3(6). The City regulations therefore are directed at public safety even though they achieve this goal, in part and incidentally, by regulating the conduct of workers.

Police powers that protect everyone in the City will naturally regulate some workers. Many of the regulations that protect New Yorkers on a daily basis may bear upon the conduct of workers, but nonetheless can be considered laws of general applicability. They are specific applications of a general prohibition on conduct that endangers the populace, such as taxi regulations that protect drivers while protecting passengers and pedestrians. The point is best appreciated by imagining the crowded city without such regulations.

19

The Supreme Court cited fire and traffic safety laws as prime examples. Gade, 505 U.S. at 107. Consider a state or local regulation concerning the use of bridges and tunnels by drivers of rigs carrying explosive materials. OSHA may protect truck drivers, and may specifically protect truck drivers who are moving explosive loads. But the state or local regulation is not *directed at a workplace*: its main concern is the safety of the population, and the security of the infrastructure. A regulated truck driver, like any member of the general public, cannot expose fellow citizens to unreasonable danger. The City's crane regulations, like fire codes and traffic laws, are an exercise of the police power to protect the safety of the public in a crowded metropolis.[10]

---

[10] A further example: New York's Fire Code regulates the use of welding devices. See N.Y.C. Rules of the Fire Dep't § 2609-01(b). The regulations apply to anyone who picks up a welding torch, and are presumably intended both to protect the welder from injury and to protect New York's dense city blocks from fire. OSHA also regulates welding, but pursuant to its congressional mandate, it does so for the safety and health of covered workers. See Subpart Q-- Welding, Cutting and Brazing, 29 C.F.R. § 1910.251-.255. The City's fire safety requirements, although they may directly and substantially protect workers, would be laws of general applicability saved from preemption. See Gade, 505 U.S. at 107.

The Steel Institute relies heavily on the Eleventh Circuit's decision in Associated Builders & Contractors Florida East Coast Chapter v. Miami-Dade County, 594 F.3d 1321 (11th Cir. 2010) (per curiam). Miami's wind-load standard for tower cranes was held to be preempted by OSHA regulations on the same subject. Id. at 1323. Even if it were binding on us, which of course it is not, the case is distinguishable. The ordinance was not a public safety measure because in Miami "[c]onstruction job sites are closed to the public and it is undisputed that the Ordinance's wind load standards regulate how *workers* use and erect tower cranes during the course of their employment." Id. at 1324. It was deemed significant that Miami "failed to identify a single incident in which a crane accident injured a member of the general public during a hurricane." Id. Moreover, although the Eleventh Circuit cited Gade, it did not consider whether Miami's ordinance could be saved from preemption as a law of general applicability. Id.

In sum, the City's crane regulations are dual impact regulations that affect both public safety and worker conduct. Because there is a federal standard in place addressing much the same conduct, the City regulations are preempted unless exempt under Gade as laws of general

21

applicability.  We conclude that they are laws of general applicability, not directed at the workplace, that regulate workers as members of the general public, and are therefore saved from preemption.

V

The parties dispute whether deference is owed to the Department of Labor's views on whether the City's crane regulations are preempted.  We do not defer to an agency's legal conclusion regarding preemption, but we give "some weight" to an agency's explanation of how state or local laws may affect the federal regulatory scheme.  Wyeth v. Levine, 555 U.S. 555, 576-77 (2009); see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 883 (2000).  "The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness."  Wyeth, 555 U.S. at 577 (citing United States v. Mead Corp., 533 U.S. 218, 234-35 (2001), and Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

OSHA cannot tell us whether the City regulations are preempted or whether the Gade exception applies.  But we are reassured by OSHA's view--to the extent that it is based on OSHA's long experience in formulating and administering

22

nationwide workplace standards--that the City regulations (and other municipal codes like it) do not interfere with OSHA's regulatory scheme.

The preamble to the 2010 amendments of OSHA's crane regulations specifically references this case and states that the City's crane regulations are not preempted. 75 Fed. Reg. at 48,129. The Department, now as amicus, takes the same position. That view is consistent with longstanding OSHA policy. For example, in 1972, OSHA issued a policy statement addressing local fire regulations:

> It is the belief of [OSHA] that it was not Congress' intent in passing the Act to preempt these extensive [fire regulation] activities with respect to places of employment covered by the Act. While there is an overlap of jurisdiction in workplaces, [OSHA] feels that the much broader goals of fire marshals' activities preclude their being preempted.

OSHA Policy Statement Concerning State & Local Fire Marshall Activities, at 1 (1972) (cited in Mem. of Law of the Secretary of Labor as Amicus Curiae in Support of Defendant ("Dist. Ct. Amicus Br."), Att. 3, Steel Inst. of N.Y. v. City of N.Y., No. 09-cv-6539 (S.D.N.Y. Jan. 6, 2011)). Similarly, a 1981 OSHA directive indicated that "[s]tate enforcement of standards which on their face are predominantly for the purpose of protecting a class of persons larger than employees" would not be preempted, even

23

when a federal standard is in place. OSHA, The Effect of Preemption on the State Agencies Without 18(b) Plans, at 2 (1981) (cited in Dist. Ct. Amicus Br., Att. 4).

In 1992, the United States (on behalf of the Department of Labor) submitted an amicus brief in Gade, advocating the view--partly adopted by the Court--that "[a] state law of general applicability that only incidentally affects workers, not as a class, but as members of the general public, cannot fairly be described as an 'occupational' standard." Br. for the U.S. as Amicus Curiae Supporting Resp't, at 24 n.14, Gade v. Nat'l Solid Wastes Mgmt. Ass'n, No. 90-1676 (Mar. 2, 1992) (cited in Dist. Ct. Amicus Br., Att. 5). "[The Act] does not typically preempt state fire protection, boiler inspection, or building and electrical code requirements, even though there are OSHA standards on these subjects, because the state standards do not aim to protect workers as a class, and do not have that primary effect." Id.

Although no deference is compelled, we grant "some weight" to OSHA's view in reaching our conclusion that local regulatory schemes such as the City's crane regulations have the aim and primary effect of regulating conduct to secure

the safety of the general public, rather than the safety of workers in the workplace.

The City's crane regulations are saved from preemption as laws of general applicability.  The judgment is affirmed.